Case vacated and remanded by Supreme
Court opinion filed 5/20/02

Cert granted by Supreme Court
order filed 1/4/02

Filed:  August 17, 2001

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 99-4162(L)
(CR-97-365-CCB)

United States of America,

                                        Plaintiff - Appellee,

        versus

Leonard Cotton, etc., et al.,

                                        Defendants - Appellants.

O R D E R

The court amends its opinion filed August 10, 2001, as follows:

On page 3, section 3, line 2 -- the sentence is corrected to read "Judge Luttig wrote the opinion, in which Judge Gregory joined."

On page 10, second full paragraph, lines 7-8; and page 12, footnote 5, lines 5-6 -- the parenthetical is corrected to read "Wilkins, J., joined by Wilkinson, C.J., and Williams and Traxler, JJ."

On page 11, first full paragraph, line 1 -- the phrase "there are cases when" is corrected to read "there are cases in which ...."

On page 24, third full paragraph, line 12 -- the quoted material inside the parenthetical following <u>United States v. Young</u> is corrected to read "per se approach to plain-error review is flawed."

For the Court - By Direction


/s/ Patricia S. Connor
Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                              No. 99-4162

LEONARD COTTON, a/k/a Cooch,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                              No. 99-4163

DARLENE GREEN, a/k/a Sprinkles,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                              No. 99-4164

MARQUETTE HALL, a/k/a Butt Naked,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                              No. 99-4175

LAMONT THOMAS, a/k/a Tree,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 99-4189

MATILDA HALL,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 99-4190

JOVAN POWELL,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                      No. 99-4191
JESUS HALL, a/k/a Weedy, a/k/a
Jesse Hall,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 99-4197

STANLEY HALL, JR., a/k/a Boonie,
Defendant-Appellant.

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CR-97-365-CCB)

2

Argued: April 4, 2001

Decided: August 10, 2001

Before WILKINSON, Chief Judge, and LUTTIG and
GREGORY, Circuit Judges.

_____

Affirmed in part and vacated and remanded in part by published opin-
ion. Judge Luttig wrote the opinion, in which Judge Gregory joined. Chief
Judge Wilkinson wrote an opinion concurring in part and dissenting
in part.

_____

## COUNSEL

**ARGUED:** Thomas J. Saunders, Baltimore, Maryland; Arthur Sam-
uel Cheslock, Baltimore, Maryland, for Appellants. Christine Man-
uelian, Assistant United States Attorney, Baltimore, Maryland, for
Appellee. **ON BRIEF:** John D. Ash, Baltimore, Maryland, for Appel-
lant Jesus Hall; Timothy J. Sullivan, SULLIVAN & SULLIVAN,
College Park, Maryland, for Appellant Thomas; Walter McCord, Bal-
timore, Maryland, for Appellant Green; David R. Solomon, Balti-
more, Maryland, for Appellant Matilda Hall; William H. Klumpp,
Fallston, Maryland, for Appellant Powell; Stanley H. Needleman,
Baltimore, Maryland, for Appellant Stanley Hall. Stephen M. Schen-
ning, United States Attorney, Baltimore, Maryland, for Appellee.

_____

## OPINION

LUTTIG, Circuit Judge:

Stanley Hall, Jr. and seven other members of a drug organization
(collectively "appellants") were convicted of one count of conspiracy
to distribute and possession with intent to distribute cocaine hydro-
chloride and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and
846. Appellants raise a number of challenges to their convictions and

3

sentences. For the reasons that follow, we affirm the convictions, and vacate and remand for resentencing.

I.

Stanley Hall, Jr. ("Hall, Jr."), the leader of a vast drug organization, was the principal supplier of drugs in the 200 block of North Duncan Street in Baltimore, Maryland. According to testimony adduced at trial, Hall, Jr., with the assistance of a number of the other appellants, obtained a supply of cocaine in kilogram quantities from a dealer in New York City, and then "cooked" the cocaine into crack and "bagged" it for distribution. Hall, Jr. would then distribute the drugs to his dealers, including the other appellants, who would, in turn, sell cocaine and crack to their customers.

In October 1997, federal authorities obtained search warrants for the residences utilized by the appellants for their drug trade. Following the seizure of drugs, drug paraphernalia, currency, and weapons, appellants were arrested and charged with a single count of conspiracy to distribute and possession with intent to distribute cocaine hydrochloride <u>and</u> cocaine base. J.A. 86.

Appellants were convicted by a jury of the sole count of the indictment.[1] The district court sentenced Hall, Jr., Leonard Cotton, Lamont Thomas, and Marquette and Jesus Hall to life imprisonment upon finding, by a preponderance of the evidence, that over 1.5 kilograms of cocaine base was attributable to each from their participation in the conspiracy. J.A. 822-23 (Hall, Jr.); J.A. 573-74 (Thomas); J.A. 507 (Cotton); J.A. 723 (Jesus Hall); J.A. 505 (Marquette Hall). Based on the same finding regarding drug quantity, the district court sentenced Jovan Powell to 30 years imprisonment. J.A. 769-70. Matilda Hall also received 30 years imprisonment based on the district court's finding, by a preponderance of the evidence, that she was responsible for more than 500 grams, but less than 1.5 kilograms, of cocaine base from her participation in the conspiracy. J.A. 667-68. Finally, Darlene Green was sentenced to 15 years imprisonment based upon the district court's attribution of more limited quantities of cocaine base to her. J.A. 541.

_____

[1] The jury acquitted one defendant, Roger Evans.

4

Following sentencing, appellants filed a motion for a new trial on the basis of newly discovered evidence, and this appeal was stayed pending the district court's resolution of that motion. The district court subsequently denied the motion.

II.

Appellants argue that the district court erred when it sentenced them based upon its findings regarding the quantity of a drug -- cocaine base -- carrying a potentially higher statutory penalty, because the jury's verdict was ambiguous with regard to which drug was the object of the conspiracy. Thus, they contend that pursuant to our decision in United States v. Rhynes, 196 F.3d 207 (4th Cir. 1999), vacated in part on other grounds, 218 F.3d 310 (4th Cir. 2000) (en banc), the lack of a special jury verdict form requiring the jury to determine specifically whether the conspiracy involved cocaine hydrochloride, cocaine base, or both, constrained the district court to sentence appellants based on the drug carrying the lower statutory penalty.

In Rhynes, the jury was instructed that it could find defendants guilty if they distributed or possessed with intent to distribute any of the drugs charged as part of the conspiracy, which included marijuana, cocaine, heroin, or cocaine base. 196 F.3d at 237. Because the jury returned a general verdict of guilty, we held that the district court's instruction created ambiguity as to whether the jury found a conspiracy to distribute all the drugs, a single drug, or some combination thereof. See id. at 238. As a result of such ambiguity, we held that the district court could not impose a "sentence in excess of the statutory maximum for the least-punished object on which the conspiracy conviction could have been based." Id.

In the present case, there is no Rhynes error because the jury was unambiguously instructed that a conspiracy conviction could be based only upon a finding -- as charged by the government in the indictment -- that appellants conspired to distribute or possessed with intent to distribute cocaine hydrochloride and cocaine base.**2** S.A. 8

_____

**2** Nor does the jury instruction cited by appellants compel a contrary conclusion. S.A. 6 ("You are instructed that, as a matter of law, cocaine

5

("In order to establish the offense of conspiracy to distribute and possess with intent to distribute cocaine hydrochloride <u>and</u> cocaine base <u>as charged in the indictment</u>, the government must prove two elements, beyond a reasonable doubt.") (emphasis added); S.A. 13 ("If you find that the materials involved in the charged conspiracy were cocaine hydrochloride <u>and</u> cocaine base, you need not be concerned with the quantities, so as [sic] long as you find that a defendant conspired to distribute or possessed with intent to distribute <u>these controlled substances</u>, the amounts involved are not important.") (emphasis added). Furthermore, the evidence was sufficient in this case -- if not overwhelming -- to support a "construction" of the verdict that the jury found a conspiracy with regard to cocaine base <u>and</u> cocaine hydrochloride where, <u>inter alia</u>, approximately 380 grams of cocaine base and 85 grams of cocaine hydrochloride <u>were actually seized</u> from the various conspirators and "stash houses." <u>See United States</u> v. <u>Green</u>, 180 F.3d 216, 226 (5th Cir. 1999) (stating that "even where there is a conspiracy general verdict, the sentencing court can still conclude that the jury found, beyond a reasonable doubt, guilt for more than just one object-offense" when the jury has <u>not</u> been instructed in the alternative and the evidence "would support such construction of the verdict actually obtained"); <u>United States</u> v. <u>Watts</u>, 950 F.2d 508, 515 (8th Cir. 1991) (stating that where an indictment was phrased in the conjunctive and "evidence of all three drugs was introduced," the court "did not elicit an ambiguous or unclear verdict from the jury").

Accordingly, we are "more than confident, that the jury was convinced beyond a reasonable doubt that both cocaine[hydrochloride] and [cocaine base] were involved" and that appellants were convicted of <u>a single multi-drug</u> conspiracy. <u>Green</u>, 180 F.3d at 226. Because

_____

hydrochloride and cocaine base are both controlled substances as those terms are used in these instructions and in the indictment and the statutes I just read to you. You must, of course, determine whether or not the materials in question were, in fact, either cocaine hydrochloride, or cocaine base."). For, in instructing the jury on the definition of "controlled substance," the district court was not charging the jury on what it must find to convict appellants of conspiracy, but, rather, was instructing the jury that either cocaine hydrochloride or cocaine base qualify as "controlled substance[s]," as that term is defined in 21 U.S.C. § 802(6).

6

we can discern no ambiguity in this jury verdict, we conclude that the district court did not err in sentencing appellants based upon the relevant penalty provisions for cocaine base.

III.

Appellants (except Darlene Green, who was sentenced to a term of less than 20 years imprisonment)[3] also contend that their sentences are invalid under <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000), because a specific threshold drug quantity was neither alleged in the indictment nor proven to the jury beyond a reasonable doubt. Because appellants failed to raise this argument before the district court, we review for plain error. <u>See</u> Fed. R. Crim. P. 52(b); <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 731-32 (1993).

In <u>United States</u> v. <u>Promise</u>, No. 99-4737, 2001 WL 732389, ___ F.3d ___ (4th Cir. June 29, 2001), this court, sitting <u>en banc</u>, held that because drug quantity "must be treated as an element of an aggravated drug trafficking offense" under 21 U.S.C. § 841, <u>Promise</u>, 2001 WL

_____

[3] Darlene Green raises two challenges to her sentence, neither of which has merit. First, Green argues that the district court erred in failing to grant a two-level downward adjustment on the ground that she was a "minor participant" in the conspiracy. <u>See</u> U.S.S.G. § 3B1.2(b). Green admitted at trial, however, that she was a drug dealer, and, of course, in convicting her, the jury found that she was a member of the drug conspiracy. Thus, as we have previously held, a district court does not clearly err in declining to grant a dealer a downward adjustment for "minor participation" because a "seller" possesses "a central position in a drug distribution conspiracy." <u>United States</u> v. <u>Brooks</u>, 957 F.2d 1138, 1149 (4th Cir. 1992).

Second, Green contends that the district court erred in granting her a two-level upward adjustment for obstruction of justice. We reject Green's argument because there was ample evidence from which the district court concluded that Green provided "materially false information" to the jury that went far beyond a mere denial of guilt. <u>United States</u> v. <u>Romulus</u>, 949 F.2d 713, 717 (4th Cir. 1991); <u>see also United States</u> v. <u>Gormley</u>, 201 F.3d 290, 294 (4th Cir. 2000) (holding that the district court did not err in imposing an obstruction of justice enhancement where defendant's false statements went beyond "merely denying his guilt").

7

732389, at *5, the failure to charge a specific threshold drug quantity in the indictment and to submit the quantity issue to the jury constitutes plain error, see id. at *7. We further concluded that such error affects defendants' substantial rights where, as here, the defendants are sentenced to a term of imprisonment greater than that set forth in section 841(b)(1)(C) for a conviction based on an undetermined quantity of drugs, see id. at *8, and the defendants can demonstrate that their sentence is "longer than that to which[they] would otherwise be subject," United States v. Angle, No. 99-4662, 2001 WL 732124, at *3, ___ F.3d ___ (4th Cir. June 29, 2001) (en banc).

However, the question left open by Promise is whether the failure to charge drug quantity in the indictment and to submit it to the jury "`seriously affect[s] the fairness, integrity or public reputation of judicial proceedings,'" Olano, 507 U.S. at 736 (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)), so that we should exercise our discretion to recognize the error. We now answer that question in the affirmative.

A.

Our initial task is to define the nature of the error in this case. The appellants argue that the district court erred not only by failing to instruct the jury on an essential element -- drug quantity -- of an aggravated drug offense, but that the district court exceeded its jurisdiction by sentencing them for a crime with which they were never charged.**4** We agree.

In this case, the government indicted the appellants for a violation of section 841 based upon "a mixture or substance containing a detectable amount of cocaine base, commonly known as`crack.'" J.A. 86. Yet the district court, in turn, sentenced seven of the appellants to a term of imprisonment greater than twenty years, the maximum penalty provided for a violation of section 841(b)(1)(C) based upon "an identifiable but unspecified quantity" of cocaine base, Promise,

_____

**4** In contrast, the government argues, as it did in Promise, that the error is merely instructional because drug quantity need not be charged in the indictment, an argument that a majority of this court rejected in Promise. See Promise, 2001 WL 732389, at *5.

8

2001 WL 732389, at *5. Consequently, by sentencing the appellants to a term of imprisonment greater than that provided for in section 841(b)(1)(C), the appellants received a sentence for a crime -- an aggravated drug trafficking offense under section 841(b)(1)(A) -- with which they were <u>neither</u> charged <u>nor</u> convicted.

The Fifth Amendment to the United States Constitution requires that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." The Supreme Court has explained that "an indictment found by a grand jury [is] indispensable to the power of the court to try the petitioner for the crime with which he was charged," <u>Ex Parte Bain</u>, 121 U.S. 1, 12-13 (1887), and "that a court <u>cannot</u> permit a defendant to be tried on charges that are not made in the indictment against him," <u>United States</u> v. <u>Stirone</u>, 361 U.S. 212, 217 (1960) (emphasis added). Thus, when an indictment fails to set forth an "essential element of a crime," "[t]he court . . . ha[s] no jurisdiction to try [a defendant] under that count of the indictment." <u>United States</u> v. <u>Hooker</u>, 841 F.2d 1225, 1232-33 (4th Cir. 1988).

And, of course, a district court cannot impose a sentence for a crime over which it does not even have jurisdiction to try a defendant. Indeed, the Supreme Court explained just last year in <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000), that the "`indictment must contain an allegation of every fact which is <u>legally essential</u> to the punishment to be inflicted,'" 530 U.S. at 490 n.15 (emphasis added) (quoting <u>United States</u> v. <u>Reese</u>, 92 U.S. 214, 232-33 (1875)), because "[t]he judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury," <u>id</u>. at 483 n.10. Thus, because an indictment setting forth all the essential elements of an offense is both mandatory and jurisdictional, and a "defendant cannot be `held to answer' for any offense not charged in an indictment returned by a grand jury," <u>United States</u> v. <u>Tran</u>, 234 F.3d 798, 808 (2d Cir. 2000), a court is without "jurisdiction to . . . <u>impose a sentence</u> for an offense not charged in the indictment," <u>id</u>. (emphasis added); <u>id</u>. ("[A] prosecutor cannot make [a] jurisdictional end run, and then urge the court to sentence the defendant for an offense for which the defendant was neither charged nor convicted.").

To hold otherwise would be to allow the court to impermissibly broaden the indictment on its own accord during the sentencing

9

phase. To be sure, the district court's actions in this case did not technically result in a constructive amendment of the indictment as the court did not broaden "the possible bases for <u>conviction</u> beyond those presented by the grand jury." <u>United States</u> v. <u>Floresca</u>, 38 F.3d 706, 710 (1994) (en banc) (emphasis added). But there is no question that "the effect of what it did was the same," <u>Stirone</u>, 361 U.S. at 217, because the district court sentenced the appellants for a crime with which they were never charged. <u>See Promise</u>, 2001 WL 732389, at *32 (Motz, J., joined by Widener, Michael, King, JJ., concurring in part and dissenting in part, and dissenting in the judgment) ("[A]lthough the government presented the grand jury with an indictment containing only the elements necessary to charge [the defendant] with a violation of § 841(b)(1)(C), the district court sentenced him to the more serious crime defined in § 841(b)(1)(A); the court did not formally amend the indictment, but its sentence had the same effect."). In doing so, the district court encroached upon the prerogative of the grand jury, because only the grand jury has the power to broaden the charges "after an indictment has been returned." <u>Stirone</u>, 361 U.S. at 215-16.

Accordingly, the district court exceeded its jurisdiction in sentencing the appellants for a crime with which they were never charged, thus depriving them of the constitutional right to "answer" only for those crimes presented to the grand jury.

B.

Having identified the nature of the error committed by the district court, we must resolve the question that plagued an evenly divided court in <u>Promise</u> -- that is, whether we should exercise our discretion to correct the error where an indictment fails to charge drug quantity and the district court sentences a defendant to a term of imprisonment that exceeds the statutory maximum set forth in section 841(b)(1)(C). <u>Compare Promise</u>, 2001 WL 732389, at *10 (Wilkins, J., joined by Wilkinson, C.J., and Williams and Traxler, JJ.) (holding that "[i]t would be a miscarriage of justice to allow [the defendant] to avoid a sentence for the aggravated drug trafficking crime that evidence overwhelmingly demonstrates he committed"), <u>with id</u>. at *33 (Motz, J., joined by Widener, Michael, and King, JJ.) ("Certainly, sentencing a man for a crime for which he has been neither charged nor convicted seriously

10

affects the fairness, integrity, and public reputation of judicial proceedings."). Because we believe that the "nature of the error" is "fundamental," United States v. David, 83 F.3d 638, 648 (4th Cir. 1996), that the "plain error was committed in a matter so absolutely vital to defendants," Wiborg v. United States, 163 U.S. 632, 658 (1896), and, most importantly, that the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings," Olano, 507 U.S. at 736 (quoting Atkinson, 297 U.S. at 160), we "feel ourselves at liberty to correct it," Wiborg, 163 U.S. at 658.

The Supreme Court has recognized that there are cases in which an error may seriously affect the fairness, integrity or public reputation of judicial proceedings even "independent of the defendant's innocence." Olano, 507 U.S. at 736-37. One such case is United States v. Silber, 370 U.S. 717 (1962) (per curiam), in which the Court considered whether to notice a defect in an indictment. In its short per curiam opinion, the Supreme Court concluded that the defect in the indictment constituted reversible plain error even though the error was not raised in either the Court of Appeals or the Supreme Court. Silber, 370 U.S. at 717; see also United States v. Brown, 995 F.2d 1493, 1504 (10th Cir. 1993) (holding that the failure to charge an "essential element" of a crime in the indictment is an error "which should be noted by an appellate court sua sponte as plain error"); United States v. Clark, 412 F.2d 885, 887-88 (5th Cir. 1969) (concluding that the failure of the indictment to state a criminal offense "constitutes plain error within the meaning of [Fed. R. Crim. P.] 52(b) and warrants reversal by a reviewing court"); Chappell v. United States, 270 F.2d 274, 276 (9th Cir. 1959) (deciding that where the indictment did not state a criminal offense, it "constitute[d] plain error within the meaning of Rule 52(b)"); cf. Fed. R. Crim. P. 12(b)(2) (stating that the failure of the indictment to "charge an offense . . . shall be noticed by the court at any time during the pendency of the proceedings").

To be sure, the error in Silber was that the defendant was convicted based upon an indictment that did not charge a crime, whereas here the error is that the defendant was sentenced more harshly based upon an element that was not charged in the indictment. We do not believe, however, that this is a substantive distinction. We cannot imagine that the Supreme Court would believe itself bound to notice the error when a conviction is based upon a crime with which a defendant was

11

not charged on the one hand, but, on the other hand, decline to recognize the error under the equally (or possibly more) egregious circumstance where a defendant is sentenced based upon a crime that was not charged in the indictment <u>nor even presented to the petit jury</u>. <u>See Tran</u>, 234 F.3d at 809 ("If the district court acts beyond its jurisdiction by trying, accepting a guilty plea from, <u>convicting, or sentencing a defendant</u> for an offense not charged in the indictment, <u>this Court must notice such error and act accordingly to correct it</u>, regardless of whether the defendant has raised the issue." (emphases added)). Indeed, in both cases, the district court acts without jurisdiction. <u>See supra</u> at 9.

Our conclusion that the error should be noticed is further reinforced by <u>United States</u> v. <u>Floresca</u>, 38 F.3d 706 (4th Cir. 1994) (en banc), in which we corrected plain error when the district court constructively amended the indictment by instructing the jury on a different subsection of a criminal statute, <u>even though the indictment charged a federal crime</u>. 38 F.3d at 709, 714. There, we recognized the fundamental nature of the error -- namely, that "[the defendant] was held accountable in a federal court for an `infamous crime' for which he was never indicted by a grand jury." <u>Id</u>. at 713-14. We did not hesitate to say "that convicting a defendant of an unindicted crime affects the fairness, integrity, and public reputation of federal judicial proceedings in a manner most serious." <u>Id</u>. at 714.

Likewise here, we have no trouble concluding that <u>sentencing</u> a defendant for an unindicted crime also seriously affects the fairness, integrity or public reputation of judicial proceedings. Indeed, it appears from the separate opinions in <u>Promise</u> that at least six members of this court would also so hold.**5**  <u>See Promise</u>, 2001 WL

_____

**5** While we do not consider post-indictment notice to be relevant, it appears that even the four members of the court who declined to recognize the error in <u>Promise</u> would recognize the error here. For, post-indictment notice, which they found there to be "critical[]," is absent in this case. 2001 WL 732389, at *10 (Wilkins, J., joined by Wilkinson, C.J., and Williams and Traxler, JJ.); <u>id</u>. at *35 n.3 (Motz, J., joined by Widener, Michael, and King, JJ.) ("Presumably, even overwhelming and uncontroverted evidence of a defendant's guilt, without post-indictment notice, is insufficient to persuade the court <u>not</u> to notice an error like that at issue here.") (emphasis in original).

12

732389, at *33 (Motz, J., joined by Widener, Michael, and King, JJ.); id. at *13-*14 (Niemeyer, J., joined by Gregory, J.).

C.

The government argues that we should decline to recognize the error in this case because the evidence adduced at trial overwhelmingly establishes the threshold drug quantities for an aggravated drug trafficking offense. While the government may well be correct as a factual matter, the quantum of evidence is not a relevant consideration when the error stems from a defect in the indictment.

First, a reviewing court may not speculate about whether a grand jury would or would not have indicted a defendant for a crime with which he was never charged. See Promise, 2001 WL 732389, at *34 ("A court cannot rely on its own view of what indictment a grand jury could or would have issued if the grand jury was never presented with a charge, or what verdict a petit jury could or would have reached if the petit jury was never presented with an indictment.") (Motz, J., joined by Widener, Michael, and King, JJ.). To do so would usurp the role of the grand jury, which, as the Supreme Court has recognized, is "`not bound to indict in every case where a conviction can be obtained.'" Vasquez v. Hillery, 474 U.S. 254, 263 (1986) (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2d Cir. 1979) (Friendly, J., dissenting)). For that reason, we explained in Floresca that "it is `utterly meaningless' to posit that any rational jury could or would have indicted [the defendant for a different crime], because it is plain that this grand jury did not, and, absent waiver, a constitutional verdict cannot be had on an unindicted offense." 38 F.3d at 712 (emphasis in original).

Second, to the extent the government argues that we should decline to notice the error because the petit jury would have convicted appellants of an aggravated drug trafficking offense based on the overwhelming evidence adduced at trial, we reject that proposition as well. For the government's position ignores the basic principle that the grand jury and petit jury are separate and independent. Because it is well settled that the petit jury cannot usurp the role of the grand jury, it is no less evident that we cannot place ourselves in the position of the petit jury, and then, in turn, assume the role of the grand

13

jury. In effect, this would result in nothing less than a constructive amendment of the indictment, see <u>Promise</u>, 2001 WL 732389, at *13 (Niemeyer, J., joined by Gregory, J.), which itself is reversible plain error, <u>Floresca</u>, 38 F.3d at 714.

Accordingly, we vacate and remand for resentencing with instructions to sentence the appellants (except Darlene Green) to a term of imprisonment not to exceed 20 years.

IV.

After the appellants filed this appeal, they learned that James Gibson, one of the government's principal cooperating witnesses, may have lied on the witness stand. Specifically, Mary Koch, who had been designated as a Special Assistant United States Attorney to assist in the federal case against the appellants, admitted in a related state drug prosecution that she believed that Gibson's testimony at trial was inconsistent with the information he provided to the government prior to trial. According to Koch, Gibson had not been truthful in relating the involvement of his daughter, Matilda Hall, in the conspiracy.

After appellants learned of Koch's testimony, we stayed the appeal pending the district court's resolution of appellants' motion for a new trial based upon Gibson's allegedly perjurious testimony. After a full hearing on the matter, the district court denied appellants' motion, holding that even if the prosecution knowingly used perjured testimony, the materiality element for a due process violation had not been established because there was no "`reasonable likelihood that the false testimony could have affected the judgment of the jury.'" <u>United States</u> v. <u>White</u>, 238 F.3d 537, 540-41 (4th Cir. 2001) (quoting <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 433 n.7 (1995)). In denying the motion, the district court rendered detailed factual findings with regard to each appellant, specifically assessing the effect of Gibson's testimony on the trial, and the additional evidence supporting the verdicts.

Appellants argue that the district court erred in denying the motion for a new trial. We disagree. As demonstrated by the district court's findings, the government presented overwhelming evidence -- separate and apart from Gibson's testimony -- establishing: (1) that each of the appellants participated in the conspiracy; (2) their respective

14

roles in the conspiracy; and (3) the vast amounts of crack being distributed by them. <u>Cf</u>. <u>White</u>, 238 F.3d at 540 (holding that though the government may have failed to disclose exculpatory testimony, "in light of the overwhelming evidence" of defendant's involvement in narcotics sales, there was no reasonable probability that a defense based upon that testimony would have been successful). Consequently, Gibson's testimony was, in large measure, merely cumulative of the testimony provided by numerous other cooperating witnesses.[6]

Therefore, after thoroughly reviewing the record and the district court's findings, we affirm on the district court's reasoning that there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury."

V.

Finally, Jovan Powell argues that the district court erred when it failed to strike the testimony of police officer Michael Fries, who recounted that when he stopped Powell, Powell was in the possession of a key to a residence that contained vast quantities of crack cocaine. First, Powell asserts that Fries and his partner did not possess reasonable suspicion to perform an investigative stop under <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1 (1968). Second, Powell contends that even if the officers had reasonable suspicion, they were not entitled to seize the key. We reject both of Powell's arguments.

A.

Under <u>Terry</u>, "[t]he police can stop and detain a person for investigative purposes `if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" <u>Park</u> v. <u>Shiflett</u>,

_____

[6] Alternatively, appellants argue that they were entitled to a new trial under Fed. R. Crim. P. 33 on the basis of newly discovered evidence. This argument is without merit, however, because a new trial based upon newly discovered evidence is unavailable where "evidence . . . is merely cumulative or impeaching," absent exceptional circumstances which are not present in this case. <u>See United States</u> v. <u>Custis</u>, 988 F.2d 1355, 1359 (4th Cir. 1993).

15

250 F.3d 843, 850 (4th Cir. 2001) (quoting <u>United States</u> v. <u>Sokolow</u>, 490 U.S. 1, 7 (1989)). "While `reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." <u>Wardlow</u> v. <u>Illinois</u>, 120 S. Ct. 673, 675-76 (2000).

Here, the evidence establishes that Fries and his partner had reasonable suspicion to perform a <u>Terry</u> stop. Fries, an experienced street crimes and drug enforcement investigator, testified that he knew, based on his prior experience patrolling the area on "almost a daily basis," J.A. 101, that Powell was leaving a residence located in a "problem[ ]" neighborhood, J.A. 101. <u>See United States</u> v. <u>Lender</u>, 985 F.2d 151, 154 (4th Cir. 1993) ("Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street."). Consequently, when he noticed that the dwelling contained "busted out" windows and a pit bull "looking out of the front windows upstairs," J.A. 108, Fries and his partner decided to leave their patrol car and investigate the situation. When they approached Powell, Fries "questioned him as to what he was doing inside the house." J.A. 110. Powell then became visibly nervous "and answered . . . by stating he didn't live there and he wasn't in there." J.A. 111.

In denying Powell's motion to strike Fries' testimony, the district court explained that since the officers had actually witnessed Powell leaving the residence, they "had reason to believe [Powell] was lieing [sic] to them," and that Powell's dubious response coupled with the suspicious circumstances of the encounter furnished the officers with reasonable suspicion to believe that "criminal activity may be afoot." S.A. 37.

Hence, we agree with the district court that, based upon the officers' observations, they possessed reasonable suspicion to perform a <u>Terry</u> stop.

B.

Powell alternatively argues that even if the <u>Terry</u> stop was supported by reasonable suspicion, the officers did not have the right to

16

seize the key. Powell's assertion is without merit because the confiscation of the key was lawful under the "plain view" doctrine. See Minnesota v. Dickerson, 508 U.S. 366, 374 (1993) (extending the "plain view" doctrine to items seized pursuant to a lawful Terry stop).

"Under that doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." Id. First, the officers were "lawfully in a position from which they view[ed]" the key, since they were merely driving by when they viewed the object in question. Indeed, Fries indicated during his testimony that the officers noticed the key in Powell's hand as Powell was exiting the residence, prior to when the officers left the patrol car. J.A. 108, 110.

Second, the object's "incriminating character[was] immediately apparent" after the officers' lawful encounter with Powell. When the officers inquired about Powell's presence in the house, his answer indicated not only that he had no possessory interest in the residence, but that, contrary to the officer's observations, he had not been present in the house either. Thus, it was "immediately apparent" to the officers that the key was "incriminating evidence" that might have been related to any number of crimes, United States v. Jackson, 131 F.3d 1105, 1109 (4th Cir. 1997), including, most notably, a burglary or some other type of property crime, see, e.g., Md. Ann. Code art. 27, § 30 ("A person may not break and enter the storehouse of another with the intent to commit theft, a crime of violence, or arson in the second degree."); see also Dorsey v. State, 189 A.2d 623, 624 (Md. 1963) ("`Actual breaking . . . may consist of lifting a latch, drawing a bolt, raising an unfastened window, turning a key or knob, pushing open a door kept closed merely by its own weight.'"(emphasis added)) (quoting L. Hochheimer, Criminal Law § 277, at 310 (2d ed. 1904)).

Third, the officers had a "lawful right of access to the object." As the Supreme Court has explained, this requirement"is simply a corollary of the familiar principle . . . that no amount of probable cause can justify a warrantless search or seizure absent `exigent circumstances.'" Horton v. California, 496 U.S. 128, 137 n.7 (1990); United States v. Legg, 18 F.3d 240, 244 (4th Cir. 1994). Here, the officers

17

had reasonable suspicion to believe not only that there was criminal activity, but that the key itself represented evidence of a crime. Thus, an exigent circumstance was unavoidably created because the key and any incriminatory evidence contained inside the house could have been destroyed had the officers not seized the key at that particular moment. See Schmerber v. California, 384 U.S. 757, 770-71 (1966) (stating that the destruction of evidence is an exigency that justified a warrantless search); Taylor, 90 F.3d at 907 (holding that the threat of "imminent destruction of evidence of [criminal] activity" created an exigent circumstance).

Accordingly, we hold that neither the Terry stop nor the seizure of the key violated Powell's rights under the Fourth Amendment.

CONCLUSION

For the reasons stated herein, we affirm the convictions, and vacate and remand for resentencing with respect to all the appellants except Darlene Green.

It is so ordered

WILKINSON, Chief Judge, concurring in part and dissenting in part:

I concur in the affirmance of the convictions.[1] I respectfully dissent from the decision in Part III to notice the sentencing error in this case. In light of the overwhelming evidence presented, the district court concluded that the defendants were responsible for the distribution of 1.5 kilograms of cocaine base -- thirty times more than the 50 grams necessary under 21 U.S.C. § 841(b)(1)(A) to merit the sentences they received. Because it would constitute a manifest injustice to reduce these defendants' sentences when the evidence undeniably demonstrates that they committed the greater statutory offense, I would decline to notice the error.

_____

[1] In doing so, I join in all but Part III of the majority opinion.

18

I.

Seven of the eight appellants challenge their sentences with Apprendi claims. Despite an allegation of drug quantity in the initial indictment, a drug quantity was not alleged in the superceding indictment nor found by the petit jury beyond a reasonable doubt. All of the appellants were sentenced to terms of imprisonment that exceed the twenty-year maximum set forth in 21 U.S.C. § 841(b)(1)(C) for unspecified drug quantities. Five of the appellants, Stanley Hall Jr., Leonard Cotton, Lamont Thomas, Marquette Hall, and Jesus Hall, were sentenced to life imprisonment. Two others, Jovan Powell and Matilda Hall, were sentenced to 30 years imprisonment. The appellants did not raise this challenge in the district court because the Supreme Court had not yet decided Apprendi.

Under United States v. Olano, 507 U.S. 725 (1993), before an appellate court can correct an error not raised at trial, "there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights." Johnson v. United States, 520 U.S. 461, 466-67 (1997) (alteration in original) (internal quotations omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. (alteration in original) (internal quotations omitted).

Under the reasoning of this court's recent decision in United States v. Promise, No. 99-4737, 2001 WL 732389, ___ F.3d ___ (4th Cir. June 29, 2001) (en banc), the district court committed plain error in sentencing the defendants to more than the twenty-year maximum permitted by 21 U.S.C. § 841(b)'s catch-all provision. See Promise, 2001 WL 732389, at *7; 21 U.S.C. § 841(b)(1)(C) (maximum sentence of imprisonment of not more than twenty years if drug quantity has not been determined by a jury beyond a reasonable doubt). Furthermore, Promise makes clear that this error affected the defendants' substantial rights. See Promise, 2001 WL 732389, at *8.

I do not believe, however, that this court ought to notice the error in this case. Quite simply, there is no question that the defendants participated in a conspiracy to distribute more than 50 grams of cocaine base. In fact, the evidence is overwhelming that the quantity of drugs

19

in question exceeded § 841(b)(1)(A)'s "threshold" amount. The majority does not dispute this point and in fact acknowledges the overwhelming nature of the evidence against the defendants. See ante at 6 (noting that "approximately 380 grams of cocaine base and 85 grams of cocaine hydrochloride were actually seized from the various conspirators"); ante at 14 (stating that there was "overwhelming evidence" apart from cooperating coconspirator James Gibson's testimony establishing "the vast amounts of crack distributed by [the defendants]").

Courts may decline to notice a plain error when evidence of defendants' guilt is overwhelming. See, e.g., Johnson, 520 U.S. at 469-70 (refusing to notice plain error when evidence of guilt was "overwhelming" and largely uncontested); United States v. Bowens, 224 F.3d 302, 314-15 (4th Cir. 2000) (same); United States v. Johnson, 219 F.3d 349, 354 (4th Cir. 2000) (same); United States v. Cedelle, 89 F.3d 181, 186 (4th Cir. 1996) (declining to notice plain error and stating that "[c]entral" to the question of whether to notice a plain error affecting substantial rights "is a determination of whether, based on the record in its entirety, the proceedings against the accused resulted in a fair and reliable determination of guilt"); United States v. Nance, 236 F.3d 820, 823, 826 (7th Cir. 2000) (declining to recognize plain error of sentencing defendant to more than the twenty-years provided by 21 U.S.C. § 841(b)(1)(C) where the indictment did not state any drug quantity because the evidence against defendant was overwhelming); United States v. Mojica-Baez, 229 F.3d 292, 307-12 (1st Cir. 2000) (declining to notice error when indictment failed to charge defendant for using a semiautomatic weapon). See also Promise, 2001 WL 732389, at *8-10 (Wilkins, J., joined by Wilkinson, Williams, and Traxler, JJ.).

Here, the government presented, inter alia, testimony from seven of the defendants' coconspirators[2] and thirty-five Baltimore City police officers and FBI agents about the nature and extent of the defendants' far-flung narcotics enterprise. Among the most incrimi-

_____

[2] The following coconspirators served as government witnesses: Carla Malloy, Nicole Baylor, Korey Britton, Timothy Roday, James Gibson, Kowana Huntley, and Roxanne Kennedy.

20

nating evidence regarding the quantity of cocaine base (crack) is the following:

- Carla Malloy testified that in the summer of 1996 she went to a Marriott hotel in Baltimore with defendants Stanley Hall Jr., Leonard Cotton, Lamont Thomas, Jesus Hall, and Nicole Baylor. At the hotel, the group bagged one kilogram of cocaine base into ziplocks. Baylor confirmed the occurrence of this incident.

- Malloy testified that she later went to a Super 8 motel with Hall Jr. and Jesus Hall to bag one-half of a kilogram of crack.

- Baylor testified that she too bagged crack on a second occasion with Thomas at a Super 8 motel. During this incident, they bagged one kilogram of crack given to them by Hall Jr.

- Korey Britton testified that from mid-November 1996 to December 27, 1996, he sold approximately $10,000 to $12,000 of crack per week as a street runner for Hall Jr.

- Malloy testified that between December 1996 and mid-January 1997, Hall Jr. provided crack to Cotton and Thomas in quantities of one-eighth of a kilogram (125 grams).

- Malloy also testified that after January 1997 she was present on four occasions when Hall Jr. cooked cocaine powder into crack. Thomas was present on two of these occasions.

- Malloy further testified that during that same time period, she and Thomas purchased ounce quantities (28 grams) of crack from Hall Jr. for distribution.

- Britton testified that he was with Hall Jr. when Hall Jr. cooked one-quarter of a kilogram of cocaine powder into

21

crack. Hall Jr. and Britton then delivered the crack to Cotton.

- Timothy Roday testified that in 1996 and 1997, Matilda Hall either personally provided him with crack or directed him to pick up drugs from one of her sons or their workers. Roday estimated that during this time he paid Matilda Hall a total of approximately $15,000 for the crack cocaine he purchased from her and the Hall Jr. organization.

- Britton and Malloy both testified that they retrieved crack from the inside of 847 McHenry Street for Matilda Hall. Malloy stated that she took a pocketbook that contained one-quarter ounce (7 grams) of crack cocaine out of a linen closet.

- Britton testified that he delivered one-eighth of an ounce (3.5 grams) of crack to Darlene Green at Matilda Hall's request. On another occasion, Matilda Hall took an 8-ball (3.5 grams) of crack out of her bra and asked Britton to hide it for her in the trash.

- The testimony of the cooperating coconspirators was corroborated by numerous Baltimore City police officers. In particular, various state arrests and searches between February 1996 and April 1997 resulted in the seizure of a combination of 795 ziplock bags and clear bags containing approximately 380 grams of cocaine base.

- Additionally, pursuant to a federal search warrant of Jovan Powell's residence executed on October 17, 1997, the government seized 51.3 grams of crack found in a pair of Powell's sweat pants.

- Finally, during sentencing, the defendants did not argue that the conspiracy distributed less than 50 grams of cocaine base. Various defendants disputed the amount of

22

crack that should be attributed to them based on their role in the conspiracy. They also argued that the cooperating coconspirators testimony should not be credited. However, none of them disputed the amount of crack actually seized by the police officers and federal agents.

It is true that the superseding indictment did not specify the amount of drugs in question. Nor did the government subsequently file an information contending that defendants were accountable for more than 50 grams of cocaine base. Still, contrary to the majority's assertion, see ante at 12 n.5, it remains difficult to believe that defendants lacked notice that they faced 21 U.S.C. § 841(b)'s strictest penalties. First, all seven of these defendants received actual notice from the initial indictment, which specified the threshold drug quantity with which they were charged. Specifically, the initial indictment charged defendants with conspiring to "distribute and possess with intent to distribute . . . 50 grams or more of a mixture or substance containing a detectable amount of cocaine base . . . in violation of Title 21, United States Code, § 841(a)(1)." Second, because the government was presenting evidence that the defendants distributed 1.5 kilograms of cocaine base and 150 kilograms of cocaine, defendants' counsel clearly were aware that the government could seek the elevated penalties available under 21 U.S.C. § 841(b)(1)(A). Given the overwhelming evidence and the lack of any unfairness to the defendants, I would not recognize the error.

There is no injustice in holding these defendants accountable for participating in a conspiracy to distribute more than 50 grams of cocaine base. The true injustice comes from this court reducing their sentences and ignoring the effects that their vast drug distribution ring had upon the citizens of Baltimore. Ignoring the evidence and the societal effects of the defendants' actions is what "seriously affects the fairness, integrity [and] public reputation of judicial proceedings." Olano, 507 U.S. at 732 (internal quotations omitted).

II.

The majority does not make a case of injustice based on the facts of this case and does not argue that the defendants are not accountable for the drug quantity the district court attributed to them. Instead, the

23

majority focuses solely on the nature of the error-- the failure of the superceding indictment to allege a specific drug quantity -- in reaching its conclusion to recognize the plain error. I agree fully with the majority's statements about the general importance of a defendant's right to be indicted by a grand jury. However, in the course of its tribute to grand jury indictments, the majority misses two crucial points.

First, the indictment in this case was valid at the time it was filed. "It is one thing to vacate a conviction or sentence where the prosecutor failed to indict in accordance with the current state of the law. It is quite another thing to vacate a conviction or sentence based on an indictment that was entirely proper at the time." United States v. Mojica-Baez, 229 F.3d 292, 310 (1st Cir. 2000). The government had no way to predict the about-face that would later be undertaken by the Supreme Court in Apprendi and by this court in Promise.

There can be no doubt that had the prosecution been aware of the rule this court would later announce in Promise, it would have made certain that the superseding indictment mirrored the initial indictment. Specifically, it would have included the statement from the initial indictment that defendants conspired to "distribute and possess with intent to distribute . . . 50 grams or more of a mixture or substance containing a detectable amount of cocaine base." Nor is there any question, given the overwhelming evidence, that had the prosecutor included this language the grand jury would have indicted the defendants and the petit jury would have found the defendants guilty beyond a reasonable doubt.

Second, the majority inappropriately replaces the discretionary, case-by-case assessment dictated by the fourth prong of Olano with an essentially categorical approach when the error consists of an indictment defect. The Supreme Court has stressed that an appellate court must exercise discretion under Rule 52(b) when deciding whether to recognize a plain error that affects a defendant's substantial rights. See Olano, 507 U.S. at 737 (stating that "a plain error affecting substantial rights does not, without more, satisfy the [requirement that the error seriously affect the fairness, integrity, or public reputation of judicial proceedings], for otherwise the discretion afforded by Rule 52(b) would be illusory"); United States v. Young, 470 U.S. 1, 16 n.14 (1985) (stating that a "per se approach to plain-

24

error review is flawed"). <u>See also United States v. David</u>, 83 F.3d 638, 648 (4th Cir. 1996) ("It seems to us, as apparently it did to the Court in <u>Olano</u>, that only by examining the particulars of each case can the `careful balancing' reflected in the plain error rule be preserved."); <u>United States v. Patterson</u>, 241 F.3d 912, 913 (7th Cir. 2001) ("When the appellate standard is plain error (as opposed to harmless error), even the clearest of blunders never <u>requires</u> reversal; it just <u>permits</u> reversal.").

For the majority to select a category of errors a priori that must be corrected on plain error review is inconsistent with the mandate of <u>Olano</u> to examine the facts of each case and the proceeding as a whole. Its approach cannot be squared with that of the Supreme Court. The Supreme Court knows how to adopt categorical approaches and has indicated a willingness to do so under the third prong of <u>Olano</u>. <u>See Johnson</u>, 520 U.S. at 468-69 (recognizing categorical approach to structural errors that presumptively satisfy the third prong of <u>Olano</u> and listing classes of cases that present structural errors). However, the Court has never adopted a categorical approach under the fourth prong of <u>Olano</u>. Furthermore, the Court did not include indictment defects in its list of structural errors. <u>See Johnson</u>, 520 U.S. at 468-69 (gathering "very limited class of cases" that present structural errors). Thus, it is hard to believe that the Supreme Court would require all indictment defects to be noticed under the fourth prong of <u>Olano</u> when they do not even qualify as structural errors that affect a defendant's substantial rights under prong three.

In <u>Johnson</u>, the petitioner argued that <u>Olano</u> did not apply because the error she complained of was structural. <u>Id.</u> at 466. The Supreme Court rejected this argument and stated that "the seriousness of the error claimed does not remove consideration of it from the ambit of the Federal Rules of Criminal Procedure." <u>Id.</u> The Court went on to apply <u>Olano</u> based on the specific facts of the case. <u>See id.</u> at 469-70 (holding that even if the error complained of was structural and affected substantial rights, the fourth prong of <u>Olano</u> was not met because of the "overwhelming" and "essentially uncontroverted" evidence of petitioner's guilt). Indictment defects will justify recognition on plain error review in some cases. However, in cases such as this one, the indictment defect has not affected the fairness of the proceedings and should not be noticed. Moreover, other errors not selectively

25

culled by the majority for categorical treatment under the fourth prong of Olano may potentially have a severe impact on the fairness and integrity of judicial proceedings in a particular case. This is why the Olano case-specific inquiry is critical.

The majority stresses that the Supreme Court in Silber v. United States, 370 U.S. 717 (1962), found reversible plain error when an indictment did not charge the defendant with a crime. See Silber, 370 U.S. at 717-18. However, the Court did not hold that all grand jury errors must be recognized on plain error review or that every failure of an indictment to charge all of the elements required for a defendant's sentence must be noticed by an appellate court. Furthermore, several of our sister circuits have declined to recognize plain error when defendants were sentenced more strictly based on elements not charged in their indictments. The First, Seventh, and Eleventh Circuits have properly recognized that this type of indictment defect may have only the most negligible effect on the fairness and integrity of a judicial proceeding. See Mojica-Baez, 229 F.3d at 310-12 (declining to notice plain error when indictment failed to charge defendant for using a semiautomatic weapon during a robbery because there was no objection at trial, no lack of notice, and "no reason to think the grand jury would have had any trouble in rendering an indictment specifying the weapons used"); United States v. Nance, 236 F.3d 820, 823, 826 (7th Cir. 2000) (declining to recognize plain error of sentencing defendant to more than twenty years when indictment did not state any drug quantity because the evidence against defendant was overwhelming); United States v. Patterson, 241 F.3d 912, 914 (7th Cir. 2001) (same); United States v. Swatzie, 228 F.3d 1278, 1284 (11th Cir. 2000) (stating that even if district court's Apprendi error with regard to defendant's drug conviction satisfied the first three steps of the Olano analysis, the court would decline to notice the error due to overwhelming evidence of defendant's guilt).

III.

The injustices of reducing the defendants' terms of imprisonment from life or thirty years to a twenty-year maximum are manifold. The majority errs by not weighing these injustices against the gravity of the indictment defect. The integrity of this country's criminal justice system depends on the most culpable violators receiving more strin-

26

gent punishments than those less-culpable violators. In this case, the evidence is clear that defendant Stanley Hall Jr. was the kingpin of a drug conspiracy that distributed over thirty times the statutorily required amount of crack cocaine to warrant a life sentence. Under Congress' intended sentencing scheme, Hall Jr. and the conspiracy's other key players justifiably received more stringent penalties than those individuals who were less essential to the conspiracy's success. However, by reducing their sentences under 21 U.S.C. § 841(b), this court erases the differences in punishment and condemnation between the conspiracy's kingpin and its underlings.

Moreover, changing the rules of the game after it has already been fairly played does a profound disservice to the individuals whose lives have been affected by the drug trade. In one sweeping motion, this court nullifies the sacrifices made by law enforcement officers, prosecutors, and trial courts in enforcing this country's drug laws. Furthermore, the majority overlooks the ultimate sacrifice paid by the victims of the drug trade. Seen as part of the overall drug problem, the drugs at issue here may be a mere drop in the bucket. But seen in terms of individual lives, the consequences of this sort of drug distribution are incalculable. Though the victims may be unknown and unnamed insofar as this record is concerned, as a result of the defendants' crimes, some individuals somewhere are spending their lives in the service of a chemical addiction.

Congress has properly expressed its condemnation of drug distributions and their consequences. And it has calibrated the penalties associated with drug distribution so that kingpins are punished more vigorously than petty dealers. It is unfortunate to disregard Congress' clear intent when there is no question at all that the defendants here distributed the requisite drug amounts under 21 U.S.C. § 841(b) to merit the sentences they received. Under Olano, we are to notice a plain error only if a miscarriage of justice would result. Here, the true miscarriage of justice is the court's failure to respect Congress' attempt to deal with a problem which so compromises the life prospects of America's most vulnerable citizens.

27